UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
UNITED STATES OF AMERICA,     )
                              )          Criminal Action
          Plaintiff,          )          No. 22-10122-NMG
                              )
v.                            )
                              )
DONALD SALZBERG,              )
                              )
          Defendant.          )
                              )
```


BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE


VIDEOCONFERENCE

July 14, 2022


John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RPR, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

```
1    APPEARANCES:

2    On Behalf of the Government:
     Rachel Y. Hemani
3    Howard Locker
     United States Attorney's Office MA
4    1 Courthouse Way
     Suite 9200
5    Boston, MA 02210
     617-748-3510
6
     On Behalf of the Defendant:
7    David A. DeBassio
     Hinckley, Allen & Snyder LLP
8    20 Church Street
     Hartford, CT 06103-1221
9    860-725-6200

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1                    P R O C E E D I N G S

 2          THE CLERK:  Criminal action number 22-10122, United

 3   States v. Donald Salzberg.

 4          THE COURT:  Well, I have some of the agreement

 5   material.  I've got the -- associated with it, of course, is an

 6   information indicating that the defendant is prepared to plead

 7   guilty to an information.  And I'm informed that defense

 8   counsel has a copy of a waiver of indictment that they'll

 9   execute over Zoom in my presence.

10          I do have to ask the defendant a number of questions

11   because we're proceeding by Zoom as opposed to in open court

12   regarding a very serious matter, which is pleading guilty to

13   two serious felonies.  But I have a couple of questions at the

14   outset for government counsel, I guess, regarding the form of

15   the information itself and just the language that's used in the

16   information.

17          I guess perhaps the one place to start is, is it your

18   position that there are overt acts required for both of the

19   conspiracies?

20          MS. HEMANI:  It's the government's position that for a

21   conspiracy to commit health care fraud, an overt act is not

22   required.

23          THE COURT:  Is there -- excuse me?

24          MS. HEMANI:  However there are overt acts.

25          THE COURT:  No.  I see that there are.  Is there case
</pre>

```
 1    law that says overt acts are not required?
 2              MS. HEMANI:  There is, actually.  Hang on.  I'm just
 3    looking.  Some circuits disagree with it, but in terms of the
 4    First Circuit so far, the current law, I'm looking at United
 5    States v. Rodriguez-Marrero, 390 F.3d --
 6              THE COURT:  Just a little slower.
 7              MS. HEMANI:  Sorry.
 8              THE COURT:  The citation is Rodriguez-Marrero?
 9              MS. HEMANI:  Yes, 390 F.3d 1, and that's a 2004 case.
10    And it's also the United States v. Iwuala, 789 F.3d 1, and
11    that's a First Circuit case from 2015.
12              THE COURT:  Okay.  All right.
13              MS. HEMANI:  As well as the pattern, the Hornby --
14              THE COURT:  Of course.  As you know, those are not --
15              MS. HEMANI:  Understood.  But that's -- so we do --
16    it's the practice of our office to allege acts in furtherance,
17    but it's our position that an overt act is not required for
18    1349.
19              THE COURT:  Okay.  So that accounts for the
20    distinction between the conspiracy to pay and receive
21    kickbacks, allegations with respect to acts in furtherance,
22    that is, you say explicitly acts in furtherance of the kickback
23    conspiracy, but only acts in furtherance of the health care
24    conspiracy.  Is that the thrust of it?
25              MS. HEMANI:  Yes.
```

1          THE COURT:  Okay.  Let me then turn to the kickback

2     conspiracy here.  Has the defendant alleged, this defendant

3     before me, alleged to have offered or paid or solicited or

4     received or, otherwise, offer, pay, solicit or receive?  Which

5     of the verbs applied applies to him?

6          MS. HEMANI:  Solicited and received.

7          THE COURT:  Okay.  Just as a matter of charging, why

8     is it that he's charged with offering and paying?

9          MS. HEMANI:  You might have to ask somebody higher up

10    in my office, but as I understand it, the way we charge things

11    in general is disjunctively --

12         THE COURT:  But this is not applicable at all to this

13    defendant.  It's not just disjunctively.  It's restatement of

14    the statute itself without specific reference to the crime of

15    this defendant.

16         MS. HEMANI:  Right.  It's a restatement of the statute

17    itself, but the manner and means makes it clear.

18         THE COURT:  It does seem to make it clear, but that's

19    why I ask it.  That is, it's surplusage to have that extra

20    language in there and potentially misleading.

21         MS. HEMANI:  Understood.  I will pass that on to the

22    people who approve these documents.

23         THE COURT:  Right, okay.  So I've got a sense of what

24    it is or assured myself of what it is that the government says

25    it's got to prove in this case.  And Ms. Hemani, will you be

1    the person who is handling this?

2            MS. HEMANI:  Yes.

3            THE COURT:  Okay.  So I'm going to ask Ms. Beatty to

4    swear the defendant here.  I'll be referring to him as

5    Mr. Salzberg.  Although I understand that he is a doctor as

6    well, but for purposes of these proceedings, I'll be referring

7    to him as Mr. Salzberg.  Ms. Beatty.

8            (Defendant duly sworn.)

9            THE CLERK:  Can you please state your full name.

10           THE DEFENDANT:  Donald Salzberg.

11           THE COURT:  Perhaps one of your colleagues or

12    attorneys might turn the volume up a little bit or your side.

13           MR. DEBASSIO:  Your Honor, I'm asking him to move

14    closer to the microphone.  It's affixed in the conference room.

15    That was the housekeeping, moving around.

16           THE COURT:  Thank you.  So Mr. Salzberg, the purpose

17    of this hearing is for me to decide whether or not what you

18    appear to be undertaking to do, and that is to plead guilty on

19    Zoom to two very serious felonies that carry with them

20    forfeiture obligations, is a knowing and voluntary act on your

21    part.

22           In order to make that kind of determination or several

23    determinations, factual findings that I have to make, I'm going

24    to have to ask you some questions, and some of those questions

25    are personal in nature.  You'll understand I'm not trying to

```
 1    delve into your personal life, except as it makes it possible
 2    for me to know whether or not you know what you're doing and
 3    what you're doing is voluntary.  Do you understand?
 4           THE DEFENDANT:  Yes, Your Honor.
 5           THE COURT:  You know what I'd like you to do, perhaps
 6    your colleagues can help you, is I'd like to look at you, but
 7    if you can get that microphone in front of your face while
 8    you're looking at me, it will be particularly helpful.  Maybe
 9    moving up a couple of chairs.  It's a little hard for me to
10    see.  You don't have to list to the port.
11           MR. DEBASSIO:  Your Honor, Dr. Salzberg will try to
12    speak up.  He also has a condition that right now is agitating
13    his throat, so he's a little hoarse.
14           THE COURT:  Okay.  But it doesn't appear that the
15    microphone is between me and him.
16           MR. DEBASSIO:  Your Honor, the microphone is fixed on
17    the table right here.  I can't move it.
18           THE COURT:  Can Dr. Salzberg --
19           MR. DEBASSIO:  When you answer, lean closer to the
20    microphone.
21           THE COURT:  Can he move back, a couple more seats
22    back, please?  Can he move back?
23           Can you tell me how old of a man you are?
24           THE DEFENDANT:  67.
25           THE COURT:  How far did you get in school?
```

```
1              THE DEFENDANT:  I completed medical school.
2              THE COURT:  And what have you been doing for a living
3    for the past ten years?
4              THE DEFENDANT:  I was in private practice until I
5    retired two years ago, Your Honor.
6              THE COURT:  Okay.  Let me just ask in the broadest
7    possible sense, do you know what the government is accusing you
8    of here?
9              THE DEFENDANT:  Yes, I am, Your Honor.
10             THE COURT:  And have you had an adequate time to
11   consult with your counsel about the accusations and how you
12   respond to those accusations?
13             THE DEFENDANT:  Yes, Your Honor, I have.
14             THE COURT:  Are you satisfied you've received from
15   them the kind of legal advice that you need to make your own
16   determination about whether or not to plead guilty under Zoom
17   conditions to an information?
18             THE DEFENDANT:  Yes, I am, Your Honor.
19             THE COURT:  Yes, you have?
20             THE DEFENDANT:  Yes, I have.  I'm sorry.  Yes.
21             THE COURT:  So let's just turn to this more
22   specifically if we can.  Have you ever had any problem with
23   substance abuse yourself, either drugs or alcohol?
24             THE DEFENDANT:  No, Your Honor.
25             THE COURT:  Are you taking any prescription drugs at
```

1  this time?

2          THE DEFENDANT:  Yes, I do, Your Honor.

3          THE COURT:  What?

4          THE DEFENDANT:  I take a -- you want me to list all

5  the medications I'm taking?

6          THE COURT:  Yes.

7          THE DEFENDANT:  I take a medicine for my lungs called

8  OFEV.  I take Metformin for diabetes.  I am taking a medication

9  for gastric reflux, Omeprazole.  And I take nystatin for

10 elevated cholesterol.

11         THE COURT:  Is that all?

12         THE DEFENDANT:  Just a few vitamins.

13         THE COURT:  With respect to the prescription drugs

14 that you've identified here, the drug that you've identified,

15 are any of them interfering with your ability to make a

16 clear-eyed judgment in this case?

17         THE DEFENDANT:  No, Your Honor, they're not.

18         THE COURT:  Are any of them affecting your mood or in

19 any fashion affecting your attitude today?

20         THE DEFENDANT:  No, sir.  No, Your Honor.

21         THE COURT:  Okay.  Have you ever had occasion to

22 consult with a mental health professional?  By which I mean a

23 psychiatrist, a psychologist, a psychiatric social worker or

24 anyone like that.

25         THE DEFENDANT:  Yes, I have, Your Honor.

```
 1            THE COURT:  Okay.  If you can tell me just briefly
 2   what kind of medical professional dealing with mental health
 3   issues you've consulted with and what the general topic is that
 4   you've dealt with them on and the time period.
 5            THE DEFENDANT:  I began to see a -- I believe she's a
 6   CSW clinical psychologist.  I started seeing her approximately
 7   three years ago.  I'm still actively in therapy, primarily for
 8   anxiety and mild depression, Your Honor.
 9            THE COURT:  And is that associated with this case?
10            THE DEFENDANT:  Yes, it is, Your Honor.
11            THE COURT:  And did you see anyone before this?
12            THE DEFENDANT:  We actually consulted with this same
13   therapist prior to my divorce.
14            THE COURT:  Okay.  That was having to do with the
15   breakup of your marriage?
16            THE DEFENDANT:  Yes, Your Honor.
17            THE COURT:  Okay.  Now, is there anything about the
18   therapy that you've described and continuing today or
19   continuing into the present that gives you any pause about your
20   ability to make a judgment in this case?
21            THE DEFENDANT:  No, Your Honor.
22            THE COURT:  Do you think that you're in a position to
23   do that?
24            THE DEFENDANT:  Yes, I guess, Your Honor.
25            THE COURT:  We started by talking about this being by
```

1    Zoom.  Of course Zoom has become very prominent in large part

2    because we're still laboring, as the President reminded us

3    earlier this month, earlier this week, under an emergency

4    declaration having to do with the pandemic.

5         But ordinarily, in a serious matter like this, we

6    wouldn't be using Zoom.  You would be in court.  You'd be in a

7    position to consult with your counsel directly.  Although

8    you're able to do that now because you're in, I gather,

9    counsel's office.  But you'd be able to see everybody who is

10   interested in your case who shows up in the courtroom.  You

11   would get to see me responding to whatever people say.  You

12   would get to see the government counsel making their

13   presentation.  You would get to see whether or not your

14   supporters are there or whether or not people who don't support

15   you are there.

16        The short of it is, you're not getting this event

17   taking place in realtime, and that's what we generally expect

18   in something like this.

19        Now, are you satisfied that we can proceed by Zoom

20   under these circumstances?

21        THE DEFENDANT:  Yes, I am, Your Honor.

22        THE COURT:  Okay.  And you understand as well that a

23   number of defendants choose not to do that for a variety of

24   reasons.  And one of them is a strategic reason sometimes that

25   the longer the case plays out, the less likely that there will

1    be witnesses who have fresh memories about cases.  And so

2    demanding to proceed in person can spin the case out longer.

3            On the other hand, there's another factor.  Some

4    people want to get their case resolved and move on with their

5    lives.  I'm not inquiring as to which of any strategies you

6    might be pursuing.  I just want to be sure that you've

7    consulted with counsel and you know enough about what you want

8    to do in this case to proceed by Zoom even though that means

9    that it's going to be somewhat quicker than it would have been

10   otherwise.  Have you fully consulted about that?

11           THE DEFENDANT:  Yes, I have, Your Honor.

12           THE COURT:  And have you decided that this is the best

13   way for you to proceed?

14           THE DEFENDANT:  I do believe it is, Your Honor.

15           THE COURT:  Okay.  So let me make two findings at the

16   outset, and one of them has to do with you.  That is, I think

17   you're making a knowing and voluntary choice to proceed by Zoom

18   and that it's in your interest to proceed by Zoom, as you

19   perceive it.  But there's another interest, and that's the

20   public interest in seeing the case in some form of transparency

21   and with some degree of dispatch.  That's what Zoom provides in

22   an approximation of being in court.  And I'm satisfied under

23   these circumstances, you can see there are people on the Zoom

24   proceedings here, that provides the public with the various

25   things that they want and are entitled to and their interest

1    under these circumstances.  So I find it's in the public

2    interest to proceed by Zoom as we are doing so here.

3         Now, let me talk specifically about what you're doing.

4    What appears to be the case is that you're going to give up

5    very valuable constitutional rights.  There are two in

6    particular that we're going to focus on in just a moment.  One

7    of them is the right to have a grand jury charge you because an

8    information means that a grand jury is not charging you.

9    You're permitting the government to charge you directly without

10   going to a grand jury.  And from time to time, a grand jury

11   says no.  And if the grand jury says no, that means that the

12   government can't proceed.

13        You understand you're giving up that very valuable

14   constitutional right?

15        THE DEFENDANT:  Yes, I do, Your Honor.

16        THE COURT:  And by pleading guilty, of course you're

17   giving up the foundational rights that we have.  That is, the

18   right to force the government to its proof.  The government has

19   to prove each essential element of the charge against you

20   beyond a reasonable doubt in a circumstance in which you are

21   presumed innocent.  And you don't have to do anything at all.

22   You can sit back, look the government straight in the eye and

23   say, "Prove it."  And unless and until they do, you can't be

24   found guilty, unless of course you plead guilty.  So you're

25   giving up those very valuable constitutional rights.

1          Do you understand that?

2          THE DEFENDANT:  Yes, I do, Your Honor.

3          THE COURT:  Now, we talked about the plea agreement,

4    and I just want to go over it briefly, but I want to be sure

5    you understand what's involved here.

6          You're pleading guilty or proposing to plead guilty

7    under circumstances in which you're leaving it to me to make

8    the determination in this case about what the proper sentence

9    should be.  But so we all understand what the maximum could be,

10   the maximum that I can impose could be under these

11   circumstances, you can see in Section 2 of the plea agreement

12   that Count One of the information, which is the health care

13   fraud violation, conspiracy to commit health care fraud

14   violation, carries with it a maximum period of incarceration of

15   ten years' imprisonment, supervised release for three years, a

16   fine of the greater of $250,000 or twice the pecuniary gain or

17   loss, a mandatory special assessment of $100.  There's

18   potential for restitution.  There's forfeiture to the extent

19   that's alleged in the information.  And under these

20   circumstances, I believe it's the case that you may end up

21   being debarred as well, and you may be exposing yourself to

22   losing your license as a doctor.

23          Do you understand that.

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  So with respect to Count Two, the maximum

1   penalties as indicated here could be as much as incarceration

2   of five years, supervised release for three years, a fine of

3   the greater of $250,000 or twice the pecuniary gain or loss

4   involved here, mandatory special assessment of $100,

5   restitution to the degree that it's appropriate, and forfeiture

6   to the extent that it's charged in the information, again,

7   exposing yourself to perhaps debarment and perhaps losing your

8   license as a physician.  You understand that?

9          THE DEFENDANT:  Yes, I do, Your Honor.

10         THE COURT:  And I want to focus a bit on the

11  restitution element of it.  Maybe, Ms. Hemani, you can be

12  somewhat helpful to me in unpacking this here.

13         As I understand it, the government is going to be

14  looking for a money judgment forfeiture in this case, and the

15  forfeiture you're talking about is $148,730 to be entered in

16  the form of that money judgment forfeiture.  And then there's

17  $84,210 to be turned over to the Health and Human Services

18  Office of Inspector General.  And I guess I want to understand

19  what the difference, if any, is between those two things.

20         MS. HEMANI:  Sure, Your Honor.  I'm just turning to

21  the correct page of the plea agreement right now.  The $84,210

22  is money that, it was essentially cash kickbacks that the

23  doctor received that he still had and he turned over --

24  obviously we haven't forfeited it, but he turned it over

25  voluntarily, so it's money that's in the possession of HHS OIG

```
 1   right now.  And the total -- and I'll ask my colleague Howard
 2   to correct me if I get this wrong at all, but the $148,730,
 3   which is the total amount, that's -- so the scheme involved
 4   both cash kickbacks and there were payments by check every
 5   month that were purported administrative fees that were paid.
 6   And so the total amount, the $148,730, is the combination
 7   between the cash kickbacks that he received from the number of
 8   tests that he ordered and the checks that he received during
 9   the scheme.
10           THE COURT:  So is the $84,210 a constituent of the
11   $148,730?
12           MS. HEMANI:  Yes.
13           THE COURT:  Okay.  So you have that now.  I assume
14   that there's not going to be an effort to take $84,210 plus
15   $148,730?
16           MS. HEMANI:  My understanding is that is not how the
17   office operates.  I don't personally -- I'm not personally
18   involved in the asset recovery, but my understanding from
19   speaking with colleagues over the years is that we never try to
20   like double-dip in that sense, even if sometimes you can under
21   the statutory scheme, but we would only be looking --
22           THE COURT:  Are you committing to do that?
23           MS. HEMANI:  That --
24           THE COURT:  That is, not to double-dip, as you say.
25   And of course I'm asking a defendant to plead guilty --
```

1          MS. HEMANI:  Yes.

2          THE COURT:  -- at a time in which I want to understand

3    what he understands about the case.

4          MS. HEMANI:  What I can commit to you is, on behalf of

5    myself, Rachel Hemani, and I don't know if I have the authority

6    to bind the office, if that's fair to say, but I can make the

7    commitment that that is not our intention.

8          THE COURT:  How do we enforce a commitment against you

9    as opposed to the office?

10         MS. HEMANI:  I just don't know that -- I don't want to

11   commit to something that I don't know I have the authority to

12   commit to.

13         THE COURT:  Let me be clear then about that.  We're

14   going to adjourn until you can figure out what it is that

15   you've charged here and what it is that the government is

16   undertaking so that the defendant can understand fully what it

17   is that is entailed by his plea of guilty.

18         You tell me that you don't know what you're going to

19   do.  And perhaps the defendant is prepared to plead guilty in

20   the face of that, but I want to understand what it is that the

21   government is doing.

22         MR. DEBASSIO:  Your Honor, if I may interject for a

23   second on behalf of the defendant, Dr. Salzberg.  We were

24   prepared to argue that the 84,210 should be applied to the

25   148,730 and that the government not double-dip, if we were put

1    in a position where we had to make that argument.

2         THE COURT:  Right.  Well, so what we have is

3    uncertainty about that issue, right?

4         MS. HEMANI:  To the extent that I have the power to --

5         THE COURT:  Ms. Hemani, you don't.

6         MS. HEMANI:  That's often the position I'm in.  But

7    I'm telling you what my understanding is.

8         THE COURT:  You can't even change the words of the

9    indictment to make them apply to this particular case.  And so

10    I just have to tell you that when the government comes in, we

11    have to have a pretty clear understanding of what the

12    government is going to undertake.  It's clear that

13    Mr. Salzberg's attorneys contest an aspect of this and that

14    it's going to be, if you try to do it, it's going to be

15    contested.

16         Now, under the circumstances I have some considerable

17    difficulty accepting a plea.  Maybe counsel for Mr. Salzberg,

18    is it Mr. DeBassio --

19         MR. DEBASSIO:  Yes, Your Honor.  It's David DeBassio.

20         THE COURT:  Mr. DeBassio, maybe you're prepared to say

21    we'll take our luck at it, but we want to be clear that we

22    don't think the government can double-dip as a matter of law.

23         MR. DEBASSIO:  Your Honor, I don't think the

24    government can double-dip as a matter of law.

25         THE COURT:  So let's just play it out a little bit,

1    okay?  Six months from now the government tries to, and the

2    judge, me, says they can.  What are you going to do then?

3              MR. DEBASSIO:  I'm going to have a talk with Dr.

4    Salzberg about what his options are then.

5              THE COURT:  Isn't the option to say, "I didn't know

6    what I was doing when I pled guilty.  I didn't know that this

7    was going to happen.  I thought it was going to be contested

8    and that I was going to win."

9              MR. DEBASSIO:  I believe if you ask Dr. Salzberg, he

10   knows it's an issue that's going to be contested, but I

11   certainly have not guaranteed him it's an issue he's going to

12   win on.

13             THE COURT:  Okay.  So Mr. Salzberg -- that's the

14   convention that I'm using here.  Mr. Salzberg, you understand

15   that the government can take that whole amount, that is, they

16   can take not merely the -- excuse me for a minute so I can be

17   sure I've stated it properly -- $148,730, and then they would

18   add to that $82,210.  And they may be successful on that.  We

19   don't know at this point.

20             Are you prepared to plead guilty in the face of that

21   uncertainty?

22             MR. DEBASSIO:  Do you want a moment to talk?

23             THE DEFENDANT:  Can I have a moment to talk with my

24   attorney?

25             THE COURT:  Yes, you can, and I think you can go

1  offline.

2          MR. DEBASSIO:  We can step out in the hall, Your

3  Honor.

4          THE COURT:  Fine.

5          THE CLERK:  Judge, I can also mute them.

6          THE COURT:  Why don't you do both.  They're muted

7  anyway.

8          (Defendant confers with counsel.)

9          MS. HEMANI:  Your Honor, may I say something?

10          THE COURT:  Just a second, Ms. Hemani.  I just want to

11  be sure that the defendant has had an opportunity to consult

12  with his counsel.  And so, Mr. Salzberg, have you had an

13  adequate opportunity to consult with your counsel?

14          THE DEFENDANT:  Yes, I have, Your Honor.

15          THE COURT:  Okay.  So you want to go ahead then now,

16  Ms. Hemani?

17          MS. HEMANI:  Sure.  While we were on that brief break,

18  I spoke to my supervisor, and I can make the representation

19  that for purposes of forfeiture, we would apply the $84,000

20  towards the $148,730.

21          THE COURT:  That is a representation by the United

22  States upon which the defendant can rely; is that correct?

23          MS. HEMANI:  Yes.

24          THE COURT:  All right.  So Mr. DeBassio, do you want

25  to say anything further about that?  It seems to have clarified

1    that issue.

2         MR. DEBASSIO:  No, Your Honor.  As I said, that's what

3    we were going to advocate.  And with the U.S. Attorney's

4    representation on the record to that extent, I'm comfortable,

5    and as long as the doctor is comfortable with that, we're ready

6    to proceed.

7         THE COURT:  Okay.  So let's go further on this plea

8    agreement because the core of the plea agreement is a

9    calculation of what the recommendation is that the government

10   is going to make.  But I want to be sure you understand how

11   that process works.

12        Under our system, there are what are called sentencing

13   guidelines.  Those are a series of directives to the judge that

14   tell the judge what the various relevant considerations might

15   be, and you create a calculation that includes the offense

16   calculation and also the criminal history calculation.

17        The government -- the judge has to get that right,

18   irrespective of whether or not the judge is going to vary or

19   depart from it.  And in this plea agreement, the parties have

20   made an agreement about what the guidelines are going to be.

21   And they say the offense level is going to be 23.  And there's

22   an indication that you have no criminal history background.

23        I understand that correctly, don't I, Ms. Hemani?

24        MS. HEMANI:  Yes, Your Honor.

25        THE COURT:  And Mr. DeBassio?

1          MR. DEBASSIO:  Yes, Your Honor.

2          THE COURT:  So let's start with that.  What's going to

3    drive this to a fairly large degree is what the loss is to the

4    government or the loss to the victim in the case, and we can

5    get into that at some point.  But the parties have calculated

6    that the loss is more than $1.5 million and less than $3.5

7    million for which you are accountable.

8          Now, I may go higher, or I may go lower.  I'll make my

9    own determination about that.  Do you understand that?

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  And after I make those calculations with

12   respect to the guidelines, I'll have to consider the larger

13   purposes of sentencing, and they're set forth in the statute,

14   but you can see that the government undertakes to make a

15   recommendation, and their recommendation is the low end of the

16   guidelines.  And as calculated by me, not by them, by me.

17         So you're leaving it to me again to make that

18   determination about what the offense level will be, driven by

19   those numbers.  Do you understand that?

20         THE DEFENDANT:  Yes, I do, Your Honor.

21         THE COURT:  And the government says they're going to

22   ask for a fine within the sentencing range, again as

23   calculated, and that depends on what the guidelines are.

24   They're going to recommend 12 months of supervised release, a

25   mandatory special assessment of $200, which you have to pay at

1    the time of sentencing, and they're going to ask for

2    restitution of $1,337,434.  Do you understand that?

3            THE DEFENDANT:  Yes, I do, Your Honor.

4            THE COURT:  Okay.  And I may modify that, too, if I

5    have to make a determination about restitution.  It may go

6    higher.  And of course we've talked about the forfeiture, and

7    we've I think fixed that forfeiture issue.  "Fixed" in the

8    sense of the government has made a representation of the outer

9    limit of what they will be seeking by way of forfeiture.

10           So you understand that you are pleading guilty in the

11   face of uncertainty about what I'm going to do about the

12   guidelines and what I'm going to do ultimately about the

13   recommendation of the parties here.  And if I accept the plea

14   and impose a sentence that's within the guidelines or within

15   the statutory limits, you don't get to withdraw it.  You're

16   stuck with it.  Do you understand that?

17           THE DEFENDANT:  Yes, I do, Your Honor.

18           THE COURT:  Okay.  So there is another dimension to

19   this, and that is that the kind of standard plea agreement that

20   the government has in many cases, and particularly in cases

21   involving informations, involves waiver of appellate rights and

22   challenges to the conviction of the sentence.  And you'll note

23   that that's been stricken from this plea agreement by the

24   parties in recognition that I'm going to question very

25   carefully something like that, and I'm unlikely to accept that

1    kind of waiver, except with most the compelling showing that

2    the defendant knows everything about what's going to happen,

3    could happen in this case.  Because this is about me making

4    mistakes, mistakes I don't know about.

5            But in any event, you remain and continue to have the

6    right to appeal in this case.  It may not be a particularly

7    strong one, but you have that right of appeal.  Do you

8    understand that?

9            THE DEFENDANT:  Yes, I do, Your Honor.

10           THE COURT:  And the government is in a position to say

11   that you haven't complied with the guidelines -- with the plea

12   agreement.  And if they make that determination, then they can

13   withdraw the plea agreement.  You understand that?

14           THE DEFENDANT:  Yes, I do, Your Honor.

15           THE COURT:  Okay.  Now, do you have any questions of

16   me about the aspects of this plea agreement?

17           THE DEFENDANT:  No, I don't, Your Honor.

18           THE COURT:  Okay.  So one point I want to be

19   absolutely clear about is that it doesn't affect any civil

20   liability that you may have, any tax liability that you may

21   have or may later incur other than the guilty plea to this

22   case, the charges in this case.  You understand that?

23           THE DEFENDANT:  Yes, Your Honor.

24           THE COURT:  So let's go back to the earlier point

25   about giving up these very valuable constitutional rights.

1    It's not just the fundamental rights that I talked about, the

2    burden of proof resting entirely on the government at all times

3    and you being presumed innocent that you're giving up.  You're

4    giving up the right to challenge their case.

5          You would have the right to have Mr. DeBassio or his

6    colleagues cross-examine the government's witnesses.  He could

7    bring in witnesses on your behalf.  If those witnesses wouldn't

8    come in here voluntarily, I'd give him court process to force

9    them to come in here.  You could decide to take the witness

10   stand yourself, or you could choose not to.  And if you chose

11   not to, I would tell the jury, and I've observed this principle

12   myself, that we can't hold that against you.  That's another

13   very valuable constitutional right that you have, the right to

14   remain silent in the face of criminal accusation.  And by

15   pleading guilty, you're giving up all those rights in this

16   case.  Do you understand that?

17          THE DEFENDANT:  Yes, I do, Your Honor.

18          THE COURT:  The one thing that's remaining about the

19   right to remain silent is any statement that you make here

20   under oath that is perjurious or false is something that the

21   government can come after you on in a subsequent prosecution.

22   Do you understand that?

23          THE DEFENDANT:  Yes, I do, Your Honor.

24          THE COURT:  Okay.  So we go back then to what this

25   case is about ultimately.  And that is the elements of the

1    offense.  I talked a bit with Ms. Hemani about what those

2    elements might be in light of the charging decision that the

3    government made in this case, and I asked her some specific

4    questions about the offenses that are alleged here.  But I want

5    to focus you on Counts One and Two, because we dealt with the

6    forfeiture count, just to be sure that you know broad brush

7    what the elements are.

8         But I want to be sure that before I even get to that,

9    have you talked about the elements that the government has to

10   prove with your attorney?

11        THE DEFENDANT:  Yes, I have, Your Honor.

12        THE COURT:  Do you think you know enough about what

13   the government has to do to plead guilty under these

14   circumstances?

15        THE DEFENDANT:  Yes, I do.

16        THE COURT:  Have you explored with him the kind of

17   initiatives that you might pursue in this case to challenge the

18   government's case or deflect the government's case?

19        THE DEFENDANT:  We have talked about this, Your Honor.

20        THE COURT:  Okay.  Well, have you talked about it

21   enough to know that you've explored everything that's

22   available?  You may not like what's available to you but that

23   you've explored everything that can be available to you before

24   you decide to plead guilty, have you done that?

25        THE DEFENDANT:  I think I have, Your Honor.

1          THE COURT:  Let me just to be sure there's not

2     something missing.  Let me go through the two offenses that are

3     charged here.  First the charge of the health care fraud

4     conspiracy.

5          When we're talking about a conspiracy, we're talking

6     about an agreement that is as specified in the indictment, not

7     some other agreement, that existed between at least two persons

8     involved in this case, that you willfully joined that

9     conspiracy.  And "willfully" means that you acted voluntarily

10    and intelligently and with the specific intent to do the

11    underlying crime, and that one of the conspirators, during the

12    course of the conspiracy, committed an act, an overt act during

13    the period of the conspiracy, the way it's sometimes stated,

14    although the government's position as I understand it is they

15    don't have to prove overt act under these circumstances.

16         The underlying violation is health care fraud.  The

17    government has to prove that the conspirators undertook to,

18    they didn't have to complete it, but they undertook to

19    knowingly and voluntarily execute a scheme to defraud a health

20    care benefit program.  Here I guess we're dealing with

21    Medicare.

22         Second, that you acted with the intent to defraud, you

23    as a member of the conspiracy, acted with an intent to defraud.

24    They have to prove that a health care benefit program was

25    involved here, as I said, it appears to be Medicare, and that

1    they have to prove that the scheme was going to be executed in

2    connection with the payment for health care services.  That's

3    broadly what they have to prove here.

4         Now, do you have any questions of me about what the

5    government has to prove?

6         THE DEFENDANT:  No, I don't, Your Honor.

7         THE COURT:  Okay.  So let's then turn to this

8    conspiracy that is identified as receiving and soliciting

9    kickbacks in connection with Medicare.  Again, we're dealing

10   with a conspiracy here.  The government I think agrees or at

11   least as charged they have to prove what's called an overt act

12   in furtherance of the conspiracy, but the conspiracy is the

13   same kind of thing that we talked about in Count One.  That is,

14   an agreement of the type that's identified in the indictment,

15   not something else, between at least two people, to solicit and

16   receive kickbacks in connection with the Medicare program.

17        Second, that you willfully joined that agreement.  And

18   third, that one of the -- as I said, one of the conspirators

19   committed an overt act in furtherance of that conspiracy in an

20   effort to further the conspiracy.  But what they are

21   undertaking to prove here is that you as a defendant undertook

22   to involve yourself in a conspiracy that would involve the

23   solicitation of at least $148,000 and receipt of at least

24   $148,000, that approximately $148,000 was paid primarily in

25   exchange for ordering or arranging or recommending medical

1    services, that the services were covered in whole or in part by

2    Medicare, and Medicare is a federal health program, health care

3    program.

4          Now, that's broadly what the government has to prove.

5    It's not how I charge the jury.  I charge the jury much more

6    extensively regarding it.  But I want to be sure that you don't

7    have any questions now about proceeding on those two counts,

8    knowing what you know, that you're prepared to plead guilty to

9    them.  Do you have any questions?

10          THE DEFENDANT:  No, I don't, Your Honor.

11          THE COURT:  Okay.  I'm going to be turning to

12    Ms. Hemani in just a moment for her to tell me briefly what the

13    evidence would be if this case goes to trial.  I want you to

14    listen very carefully because, when she's through, I'm going to

15    turn to you and say, "Is that what happened?  Do you disagree

16    with anything that she says?"  All right.

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Okay.  Ms. Hemani, if you could.

19          MS. HEMANI:  If this case had proceeded to trial, the

20    government would have proven beyond a reasonable doubt that the

21    defendant knowingly and willfully engaged in a conspiracy to

22    commit health care fraud and conspiracy to violate the

23    antikickback statute.

24          Specifically, the government would have shown that

25    during all times relevant to the information, the defendant was

1    an ophthalmologist with a private practice in West Hartford,

2    Connecticut.

3         The defendant entered into sham rental and

4    administrative services agreements with a company called

5    Eyecuity based in Long Island in or around April 2014.  The

6    agreements were purportedly to allow Eyecuity technicians to

7    run noninvasive brain scans called transcranial doppler scans,

8    or TCDs, on patients for whom the defendant ordered these

9    tests.

10        At trial, the government would have shown that

11   Medicare and private insurance companies have strict coverage

12   criteria with respect to when they will reimburse physicians

13   for TCD scans.  Patients must have a specific diagnosis, such

14   as carotid artery stenosis, strokes, or a condition called

15   vertebral basilar artery insufficiency, or VBI, which is

16   characterized by poor blood flow to a certain part of the

17   brain.

18        Testimony from Medicare and the insurance companies

19   would have shown that, absent rare circumstances not present

20   here, insurance companies would not have paid for the test

21   without one of the required diagnoses in their coverage

22   criteria; nor would they pay for claims that are tainted by

23   kickbacks.

24        At trial we would have shown through text messages,

25   agent testimony and the doctor's own admission that he in fact

1    was paid $100 to $125 in cash per test that he ordered.  An

2    Eyecuity principal delivered the cash to the defendant each

3    month.  Sometimes they met in the doctor's office.  Frequently

4    they met in parking lots in and around the West Hartford area.

5        The two discussed the arrangement and the calculation

6    of the cash payments in detail in text messages.  Some of these

7    communications took place while the Eyecuity principal was in

8    the District of Massachusetts visiting physicians.  Eyecuity

9    also paid kickbacks to the defendant in the form of checks

10   under the purported services agreement between the defendant

11   and Eyecuity.  Billing data and TCD order forms would have

12   shown that the defendant used false diagnoses such as VBI or

13   carotid artery stenosis to order over 600 TCD tests.

14       In total, the defendant's orders resulted in more than

15   $3 million being billed to Medicare and private insurance

16   companies.  Testimony and medical records would have shown that

17   the doctor could not and did not diagnose the patients for whom

18   he ordered TCD scans with the diagnoses required by the

19   insurance companies, such as VBI.

20       And finally, I make reference to the statement of

21   facts that is attached to the plea agreement in this case and

22   incorporate by reference the additional details contained in

23   the statement of facts as a basis for the defendant's plea.

24       THE COURT:  And in connection with the statement of

25   facts, that's something that is attached to the plea agreement

1    and the parties and Mr. Salzberg has agreed to?

2            MS. HEMANI:  Yes.

3            THE COURT:  Okay.  And one further point.  I focused

4    on Medicare as the benefit program, but we're also talking

5    about private insurance companies.  Is that correct?

6            MS. HEMANI:  Yes, Your Honor.

7            THE COURT:  Okay.  So you've heard what Ms. Hemani

8    tells me the evidence would be in this case, briefly.  Do you

9    disagree with anything she said?

10           THE DEFENDANT:  No, I don't, Your Honor.

11           THE COURT:  Is that what happened?

12           THE DEFENDANT:  Yes, sir.

13           THE COURT:  Okay.

14           THE DEFENDANT:  Essentially, yes.  Yes, yes, Your

15   Honor.

16           THE COURT:  So let's go back to this idea that you're

17   pleading guilty without a grand jury charging.  A grand jury is

18   a group of individuals, 23 in number, the majority of whom have

19   to vote in favor of an information.  As I said earlier, if they

20   don't, the government can't proceed on charges like this.  So

21   by pleading guilty to an information, you're giving up the

22   right to have a grand jury look at that charge and decide

23   whether or not it should go forward.  Do you understand that?

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  Have you discussed fully with your

1    attorney the pros and cons of proceeding under an information?

2         THE DEFENDANT:  Yes, we have, Your Honor.

3         THE COURT:  Do you have any questions of me about

4    that?

5         THE DEFENDANT:  I do not, sir.  I do not, Your Honor.

6         THE COURT:  Okay.  So I mentioned at the outset or

7    during the course of this that I understand that there is a

8    copy of the information -- the waiver of indictment I should

9    say, that you're going to execute in my presence now on Zoom

10   and then I'll sign off on because I find that your decision to

11   plead to an information is a knowing and voluntary act.

12        THE DEFENDANT:  Should I do that now, Your Honor?

13        THE COURT:  Yes, if you will, yes.  Thank you.

14        So I made the finding with respect to the waiver of

15   indictment that it is knowing and voluntary.  So let me turn to

16   you, Ms. Hemani.  Do you know of any reason I shouldn't accept

17   the plea in this case?

18        MS. HEMANI:  No, Your Honor.

19        THE COURT:  Mr. DeBassio, do you know of any reason I

20   shouldn't accept the plea?

21        MR. DEBASSIO:  No, Your Honor.

22        THE COURT:  All right.  I'll ask Ms. Beatty to inquire

23   of the defendant.

24        THE CLERK:  Donald Salzberg, on criminal action number

25   22-10122, you are charged in Count One of a two-count

1    information with conspiracy to commit health care fraud in

2    violation of Title 18, United States Code, Section 1349.  How

3    do you plead as to Count One, guilty or not guilty?

4            THE DEFENDANT:  Guilty.

5            THE CLERK:  In Count Two, you are charged with

6    conspiracy to violate the antikickback statute in violation of

7    Title 18, United States Code, Section 371.  How do you plead as

8    to Count Two, guilty or not guilty?

9            THE DEFENDANT:  I plead guilty.  I'm sorry.  I plead

10   guilty.  Sorry.

11           THE COURT:  Based on the discussion we've had this

12   afternoon, I'm satisfied that Mr. Salzberg's decision to plead

13   guilty is also a knowing and voluntary act, and he's now

14   adjudged guilty of the offenses charged in the indictment.

15           The next step here is the question of sentencing.  I

16   don't think we have a sentencing date, and there's some

17   uncertainty about it.  But Ms. Beatty, do you have a date that

18   you're going to be using?

19           THE CLERK:  Not at this time.

20           THE COURT:  Okay.  In any event, I just want you to

21   understand that we'll try to get the date straightened away

22   here.  But I want you to understand that, once we do, you're

23   going to be involved in the preparation of a Presentence

24   Report.  It's a document we rely on very -- or I rely on very

25   heavily in making my judgment about what the proper sentence

1    should be in this case.

2         I told you that I'm going to be making these

3    decisions, I'm going to be evaluating carefully the proposals

4    that are made by the parties, but it's very much in your best

5    interest and also an obligation that you have to cooperate

6    fully with the Probation Office in the preparation of that

7    Presentence Report.

8         You should answer all the questions that they put to

9    you, but you get the opportunity to ask them to include things

10   in the Presentence Report, things you think I should know.

11   You'll get a chance to see the Presentence Report in its draft

12   form.  You can ask for changes or corrections.  If the

13   Probation Office doesn't make them to your satisfaction, you

14   can bring that matter up to me at the time of sentencing.  And

15   at the time of sentencing, I'll hear you and your counsel about

16   the factors I should have before me, the kinds of

17   considerations that I should give and what proposals, if any,

18   you have about the sentence that I actually should impose.  Do

19   you understand?

20        THE DEFENDANT:  Yes, I do, Your Honor.

21        THE COURT:  Now, this is essentially -- I'm sorry.

22   This is essentially an initial appearance, and I have not gone

23   through the process of asking whether or not the entire

24   information should be read to the defendant.  Under these

25   circumstances, it doesn't appear that it needs to be, but I

1    just want to make sure, Mr. DeBassio, there's no problem with

2    that, that the defendant waives the reading here.

3            MR. DEBASSIO:  No, Your Honor.  The defendant would

4    waive the reading of the information.

5            THE COURT:  Turning to the question of any conditions

6    of release here, are there proposals that the parties would

7    make?

8            MS. HEMANI:  Your Honor, the government would ask for

9    the standard conditions and also that the defendant be able to

10   travel within the United States.

11           THE COURT:  Okay.  Mr. DeBassio, anything you want?

12           MR. DEBASSIO:  No, Your Honor.  We have no objection

13   to the standard conditions, and we would again ask that Dr.

14   Salzberg be allowed to travel within the United States.  And

15   just for the record, as I mentioned to Probation when they were

16   doing the bail interview, Dr. Salzberg has brought his passport

17   to our offices, if one of the conditions of release is that

18   Probation wanted the passport to be surrendered, and we're

19   prepared to cooperate with them to take whatever steps they

20   need to secure that if that is one of the conditions.

21           THE COURT:  It is one of the conditions I think I'll

22   include.  I see Ms. Golus here.  I just want to understand

23   whether the practice now for Probation is to permit surrender

24   to counsel and counsel maintain it, or do you want it to come

25   to you?

1      U.S. PROBATION:  If Your Honor is going to order that

2  condition, then it should be surrendered to the Probation

3  Office, and I can discuss with counsel that Mr. Salzberg can

4  surrender that when he meets with Probation.

5      THE COURT:  Okay.  I think I would prefer that,

6  Mr. DeBassio.  That is, surrender to Probation.

7      MR. DEBASSIO:  Absolutely, Your Honor.  As the court

8  accommodated us with the Zoom hearing, you know, we were trying

9  to anticipate issues that may come up during the hearing and be

10  proactive about addressing them.

11      THE COURT:  I appreciate that, and I just have to say

12  that probably not so much in this case but in other cases there

13  are some wrinkles that sometimes make this quite difficult.

14  And for surrender, either to Probation and to counsel, it may

15  expose counsel in ways they shouldn't be exposed.

16      So in any event, I'll follow Ms. Golus' suggestion.

17  That will be a requirement.  Once you appear before Probation,

18  you'll have to do that immediately.  I will impose the kind of

19  personal recognizance bond here with no money on that.  And

20  then with the standard conditions, Ms. Golus, did you want

21  to --

22      U.S. PROBATION:  Your Honor, we just had two

23  conditions in the bail report we would ask for.  One is to

24  report to U.S. Probation and Pretrial Services as directed.

25      THE COURT:  Right.

1          U.S. PROBATION:  The second one is to avoid all

2     contact, directly or indirectly, with any person who is or may

3     be a victim or witness in the investigation or prosecution.

4     That would be any names provided by the AUSA in this case.

5          THE COURT:  Okay.  And Ms. Hemani, are you going to be

6     providing a list of persons who the defendant should not be

7     communicating with?

8          MS. HEMANI:  Yes, Your Honor.  I've found in the past

9     sometimes that the easiest way to do that is by category of

10    people and where they work as opposed to each individual.

11         THE COURT:  However you do it, the reason I ask it

12    this way is that I do want there to be fair notice to the

13    defendant.  So if the answer is everybody who lives in Avon,

14    Simsbury and West Hartford, I think I probably won't go with

15    that.  If by contrast the categories that you describe apart

16    from particular individuals are sufficiently clear that, if the

17    defendant does contact them, that he knows that he's in

18    violation, I accept that.

19         MS. HEMANI:  Yes, Your Honor.  And I will speak with

20    Mr. DeBassio and make sure that we are in agreement that we can

21    give a specific enough identification of the categories that

22    the doctor can comply with that.

23         THE COURT:  Okay.  So is there anything further that

24    we need to do?  That is, we'll get this straightened away as

25    promptly as possible, recognizing that there's a little bit of

1    lead time involved here.

2            U.S. PROBATION:  Just briefly, Your Honor, I would

3    recommend that Ms. Beatty email defense counsel the order of

4    conditions of release that they can sign, have Mr. Salzberg

5    sign and return.  And just, since I can't meet with counsel

6    after, I am going to email counsel for the defendant with

7    reporting instructions to meet with Probation.

8            THE COURT:  Right.  We'll get that out promptly.

9    We've got that clarified.  It won't have yet the addition that

10   Ms. Hemani is going to include about the contact list that's

11   developing, but we'll get that out, and then once we get

12   everything together, it will be the final order here.

13           U.S. PROBATION:  Great.  Thank you, Your Honor.

14           THE COURT:  Thank you.  If there's nothing further, we

15   will be in recess.  Thank you.

16           MR. DEBASSIO:  Your Honor, before we sign off,

17   Attorney DeBassio on behalf of Dr. Salzberg.  One consideration

18   I wanted to bring up is the special assessment is usually paid

19   the day of the plea.  And we are obviously not in Boston, so we

20   were -- we don't want Dr. Salzberg to start off being

21   immediately in violation and wanted to, again, since we were on

22   Zoom, ask the court's direction as to does he have a certain

23   amount of time to pay it?  You know, how are we going to deal

24   with that issue?  Again, I believe it's $200, but I don't want

25   to start him off on a bad foot right away.

1          THE COURT:  Sure.  I think that what I would -- maybe

2   Ms. Beatty has got a closer relationship with the finance

3   department, but have that sent to you, Ms. Beatty, and then

4   that be submitted to the Probation Office in some form of

5   cashier check?

6          THE CLERK:  It's my understanding a special assessment

7   is paid upon judgment, not upon the plea.  Is that correct,

8   Iris?

9          U.S. PROBATION:  Yeah.  That's what I was going to

10  say.  The payment should be made at sentencing because the

11  clerk's office won't have any idea what to do with it at this

12  point.

13         THE COURT:  Right.  I think the problem -- not

14  problem, but the issue that has Mr. DeBassio concerned may be

15  related to the plea agreement itself.  I just want to go back

16  to look at it.

17         MS. HEMANI:  Your Honor, page 2 it says by the date of

18  sentencing.

19         THE COURT:  Yes, okay.  I appreciate your concern to

20  be punctilious, Mr. DeBassio, but you got a breather on this

21  one.

22         MR. DEBASSIO:  I apologize, Your Honor.  That just may

23  be my -- I'm more familiar with the Connecticut practice.

24         THE COURT:  It does vary from time to time.  That's

25  why I wanted to go back and look at that document myself.

1          MR. DEBASSIO:  I appreciate all of you, Your Honor,

2    Assistant United States Hemani, and the clarification for that.

3    Thank you.

4          THE COURT:  Okay.  So with that, we'll be in recess.

5    Thank you very much.

6          (Adjourned, 3:46 p.m.)

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Kelly Mortellite, Registered Professional

4     Reporter, Registered Merit Reporter and Certified Realtime

5     Reporter, in and for the United States District Court for the

6     District of Massachusetts, do hereby certify that the foregoing

7     transcript is a true and correct transcript of the

8     stenographically reported proceedings held in the

9     above-entitled matter to the best of my skill and ability.

10                         Dated this 12th day of March, 2024.

11

12                         /s/ Kelly Mortellite

13                         _____

14                         Kelly Mortellite, RPR, RMR, CRR

15                         Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```